# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

WESLEY FINANCIAL GROUP, LLC,    **CASE NO.:** 6:23-cv-2347-RBD-LHP

    Plaintiff,

    v.

WESTGATE RESORTS, LTD., et al.

    Defendants.

_____/


## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S FIRST AMENDED COMPLAINT
## <u>AND INCORPORATED MEMORANDUM OF LAW</u>

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants (collectively referred to as "Westgate"), move this Court to dismiss Plaintiff Wesley Financial Group, LLC's ("Wesley") First Amended Complaint, Dkt. No. 29 (the "FAC").

## PRELIMINARY STATEMENT

"In a field in which catchwords have often been dominant there is a grave risk of applying a tag with mechanical literalness." *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 151 (9th Cir. 1989). Wesley's FAC takes this admonition about antitrust law to new heights, using terms such as "product," "market," "monopoly," "market power," "collusion," "conspiracy," and even "legitimate" in ways that have no plausible basis in economics, fact, and/or law.

Wesley alleges Westgate has abused the court system by filing a lawsuit against it. *See* FAC at ¶6. Psychologists call this projection, and Wesley's false description of that lawsuit is pure denial. Far from being the "legitimate business" that it claims to be, (*id.* at ¶64), ***Wesley has been judicially determined to be an unlawful and illegal business***. The federal district court in Wesley's home forum ruled, on summary judgment, that Wesley's "exit services" business is a scam, does not offer any valid services, and regularly engages in deceptive trade practices and thus ***violates the main consumer protection statute in Wesley's home state, the Tennessee Consumer Protection Act*** ("TCPA"). *See Westgate Resorts, Ltd. v. Wesley Fin. Grp., LLC*, No. 3:20-CV-00599, 2023 WL 5062065 (M.D. Tenn. Aug. 8, 2023). The court found Wesley's business activities constitute the unauthorized practice of law and

"mislead customers . . . into believing that Wesley is providing a 'legal' service when it is not," which cause them "to believe that they had a legal basis for stopping payment on their mortgages and that they could achieve cancellation of their timeshares through some legal activity engaged in by Wesley, aside from the owners' payment default" that Wesley deceptively causes. *Id.* at *19.[1] Wesley traffics not in any valid services, but scams and deceit to cause payment defaults.[2]

Westgate, on the other hand, sells deeded real property timeshare interests to interested consumers, which are purchased through contracts that often involve seller-provided financing and have attendant annual maintenance fee obligations. This lawsuit, though, is not about that product or the indisputably competitive market in which Westgate sells timeshares. To manufacture a baseless antitrust claim, Wesley concocts the idea of an "exit product" offered only by Westgate sold in a "market" limited only to dissatisfied current Westgate owners, thus creating a "monopoly." The "exit product" consists of any conceivable way a timeshare owner can have their timeshare contract with Westgate terminated, including even foreclosure and a purchaser's default (*i.e.*, not making the required pre-closing payments) – yes, Wesley somehow alleges Westgate offers a "product" of not getting paid for the product that it actually sells. Wesley alleges that these "products" and "markets" exist for each timeshare

---

[1] In a stunning lack of candor, Wesley's only reference to any summary judgment ruling is to state that Westgate's "FDUTPA claim was dismissed on summary judgment." FAC at ¶6. But that was solely because the court concluded "this lawsuit is governed by Tennessee law," (*Westgate*, 2023 WL 5062065 at *1), and found Wesley violated Tennessee's analogous statute.

[2] As this Court knows well, Wesley is hardly the only timeshare exit company or law firm that a

developer, which, of course, has a "monopoly" in its brand-specific "market," and there is also a corresponding brand-specific "exit services" "market" consisting only of each respective developer's dissatisfied owners for services to "access, select, and execute" the "exit products." Wesley claims to be the largest third-party timeshare "exit services provider."

As detailed below, Wesley misuses every claim and nearly every legal concept invoked in the FAC. An unlawful business cannot show standing to bring an antitrust claim and, in any event, Wesley never plausibly alleges any harm to competition required for antitrust standing. "Exit products" are not "products," they are not "sold" in "markets," Westgate does not sell "exit services," and there is no exercise of "market power." Westgate does not have a market relationship with people looking to terminate their Westgate timeshares; they are already in a contractual and legal relationship resulting from the timeshare purchase. The requirement that Westgate's assent must be obtained to voluntarily terminate a timeshare interest arises from a contract, not "market power." These are major reasons why Wesley's claims fail, but by no means the only reasons. [3]

## ARGUMENT

## I. APPLICABLE LEGAL STANDARDS

A complaint must contain sufficient factual matter, which, if accepted as

---

court has found to employ a deceptive business model that causes consumer injury. *See*, *e.g.*, *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1327 (M.D. Fla. 2019) (Dalton, J.).

[3] For example, Wesley's claims arise out of the same aggregate of operative facts as the "Nashville Litigation" (*i.e.*, "exit services" and the lawsuit itself), and thus were compulsory counterclaims that needed to be raised there, and are barred in this action. *See* Fed. R. Civ. P.

true, would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Legal conclusions stated as "factual allegations" do not count. *Id.*

## II. WESLEY'S ANTITRUST CLAIMS SHOULD BE DISMISSED

### A. Wesley Lacks Antitrust Standing

A private plaintiff suing under the antitrust laws must allege and show that it has antitrust standing. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1072-73 (11th Cir. 2004); *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997). This "involves more than the 'case or controversy' requirement that drives constitutional standing," and requires that the plaintiff suffer "antitrust injury" and be an efficient enforcer. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448-49 (11th Cir. 1991).

"Antitrust injury is defined as 'injury of the type the antitrust laws were intended to prevent,'" namely "the protection of competition, not competitors." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977)). Moreover, "a plaintiff must show that it is a customer or competitor in the relevant antitrust market." *Fla. Seed*, 105 F.3d at 1374. Wesley alleges "[t]he relevant antitrust market is for the provision of exit services to Westgate customers who desire an exit from their timeshare contracts," *i.e.*, the "Westgate Exit Services Market." FAC at ¶118. Wesley, though, fails to make any "specific factual allegations" of any "damage to competition" in that market. *Jacobs v.*

13(a); *Montgomery Ward Dev. Corp. v. Juster*, 932 F.2d 1378, 1381 (11th Cir. 1991); *Critical-*

*Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010). It conclusorily asserts reduced output and "more expensive," "lower quality," and "less efficient exit products." FAC at ¶¶172, 183. These are hollow buzzwords, without any specifics or rational explanation as to how the alleged conduct has the claimed effects.[4] Wesley also suggests lower quality from Westgate by "not reveal[ing] the existence of foreclosure or deed in lieu exits," (*id.* at ¶¶139, 161), but how then are such "exits" Westgate's "default" and "standard exit" and how could Westgate condition acceptance of a "deed in lieu of foreclosure" on the submission of an affidavit while concealing the existence of such a deed? *Id.* at ¶¶89, 152-54. Wesley's own standard form contract also contradicts any suggestion of lower quality from such an "exit," as it expressly states a foreclosure or deed in lieu qualifies as a successful termination for purposes of its own "exit services." *See* Ex. A at §4; Ex. B at §1(D) (defining "Termination" to include both); *id.* at §9.[5]

As for price, Wesley's own allegations are fatal to any showing of antitrust injury. Wesley concedes that the ***average*** price for its "exit services" of $8,000 is significantly more than double the ***maximum*** of $3,000 that it alleges Westgate charges (fees that Westgate would charge regardless of whether a third-

---

*Vac Filtration Corp. v. Minuteman Intern, Inc.*, 233 F.3d 697, 699 (2nd Cir. 2000).

[4] The assertion that Westgate's "exit services" are lower quality appears to be a reference to the indisputable fact that while Wesley makes false representations that cause its customers to stop making their mortgage and maintenance payments, (*Westgate*, 2023 WL 5062065 at *19-20), Westgate requires that they remain current on their maintenance fees. FAC at ¶67. A "service" that violates the TCPA and unlawfully harms consumers cannot be high quality.

[5] Because Wesley "refers to [its form contracts] in the complaint," (*e.g.*, FAC at ¶¶60-61, 85, 87, 218), and those documents are central to the plaintiff's claim[s]," the Court can consider the form contracts in deciding this Rule 12(b)(6) motion. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

party exit company is used). *See* FAC at ¶71(a). Wesley is thus invoking the antitrust laws to charge consumers significantly more than it contends it has been able to do so far. That "is inimical to the purposes of [the antitrust] laws," (*Brunswick*, 429 U.S. at 488), and antitrust injury cannot be found where the plaintiff stands to benefit from *higher* prices to consumers. *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1383-84 (11th Cir. 1997); *Todorov*, 921 F.2d at 1454. Counts II-VI should be dismissed on these grounds alone.

The indisputably unlawful nature of Wesley's business, causing harm to the public through repeated violations of the TCPA, separately and **totally** precludes antitrust standing. *Westgate*, 2023 WL 5062065 at *19-20. The Middle District of Tennessee's partial summary judgment is final and satisfies all requirements for issue preclusion.[6] It is therefore established in this lawsuit, too, that Wesley's business is an unlawful enterprise directed against the general public.[7] "Courts have long recognized that an action under the antitrust laws will not lie where the business conducted by the plaintiff, and alleged to have been restrained by the defendant, was itself unlawful. . . . [A] party cannot prove a cognizable antitrust injury when it itself engaged in unlawful conduct *ex ante*." *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004) (internal quotation and citations omitted).[8] Antitrust law does not allow illegal

---

[6] *Christo v. Padgett*, 223 F.3d 1324, 1339 n.47 (11th Cir. 2000); *Petchem, Inc. v. Canaveral Port Auth.*, No. 6:04-CV-1080-ORL-28KRS, 2005 WL 1862412, *4 (M.D. Fla. Aug. 2, 2005).

[7] Violations of the TCPA are Class B misdemeanors. Tenn. Code Ann. § 47-18-104(a). The unauthorized practice of law is a Class A misdemeanor. Tenn. Code Ann. § 23-3-103(b).

[8] *See also PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d

businesses that should have never been operating to sue for claimed injuries.

## B.  Wesley Fails to State a Tying Claim (Counts II and III)

Wesley asserts a tying claim under both *per se* and rule of reason approaches.  "A tying arrangement is an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992).  A tying claim has five elements:

> (1) a tying and a tied product; (2) evidence of actual coercion by the seller that in fact forced the buyer to purchase the tied product; (3) that the seller [has] sufficient market power in the tying product market to force the buyer to accept the tied product; (4) anticompetitive effects in the tied market; and (5) involvement of a not insubstantial amount of interstate commerce in the tied product market.

*Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502-03 (11th Cir. 1985).[9]  This claim fails under either approach.

### 1.  The FAC Fails to Allege Two Tied Products for Sale

First, there is no such thing as an "exit product" or a "Westgate Exit Product Market."  The ways "timeshare owners [are] terminated by their developers," *i.e.*, "a mutual release, deed in lieu of foreclosure, deed back, charge

---

301, 329-30 (S.D.N.Y. 2021); *Datel Holdings LTD. v. Microsoft Corp.*, No. C-09-05535 EDL, 2010 WL 3910344, *4 (N.D. Cal. Oct. 4, 2010); *RealNetworks, Inc. v. DVD Copy Control Ass'n*, 2010 WL 145098, *6 (N.D. Cal. Jan. 8, 2010); *Pearl Music Co. v. Recording Indus. Ass'n of Am., Inc.*, 460 F. Supp. 1060, 1067-68 (C.D. Cal. 1978).

[9] A *per se* tying claim still requires "a showing of market power in the tying product."  *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 35 (2006).  In any event, "[i]n the Eleventh Circuit, the *per se* rule is applied reluctantly, and only when experience with a particular type of restraint enables the court to predict with confidence that the rule of reason will condemn it."  *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1360 (S.D. Fla. 1998).  Given the

off, purchaser's default, or foreclosure," (FAC at ¶¶63, 126, 149, 166), are not products. These are transactions or legal procedures between counter-parties to a contract to terminate their contractual arrangement. Further through this looking glass, Wesley alleges an upside-down "market" where the purported monopolist seller intentionally "stonewalls" consumer interest in the so-called "exit products," pretends to offer "false and illusory" services, and instead aims to sell more of the thing the consumers have been defined to already have and not want, and what is sold in a separate, competitive market: Westgate timeshares. *Id.* at ¶¶56, 66, 74, 139, 159. That is an implausible product market. Courts have repeatedly rejected attempts in tying claims to apply the "product" label to things that clearly are not commercially distributed products.[10] Westgate is no more selling an "exit product" than a party to a contract that requires mutual agreement to terminate without cause sells a "contract termination product."

Second, Westgate is not offering anything – "exit product" or otherwise – for sale. The FAC itself alleges that when Westgate elects to enter into these transactions, it does so to "repurchase" or "re-acquire" in-demand timeshares for later resale. *See* FAC at ¶¶55 & 160. Parties who obtain properties through foreclosures or deeds in lieu of foreclosure – the "standard exit" or "default exit" approach according to the FAC, (*id.* at ¶154) – are referred to in the law,

---

lack of any precedent or economic sense for the tying claim, no such prediction is possible here.
[10] *See De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (employee access to a database); *Acuity Optical Lab'ys, LLC v. Davis Vision, Inc.*, No. 14-CV-03231, 2016 WL 4467883, \*18 (C.D. Ill. Aug. 23, 2016) (in-network status); *Nordic Bank PLC v. Trend Grp., Ltd.*, 619 F. Supp. 542, 559-60 (S.D.N.Y. 1985) (forbearance on collection of debt).

including the Florida Condominium Act, as acquirers, buyers, and "foreclosure purchasers," and the borrower is the seller.[11]  When Westgate proposes to do the same, it likewise offers to acquire a timeshare for certain consideration under certain terms, including the satisfaction or discharge of debt and often the seller paying transactional costs (the alleged "fees").  Because a tying claim requires that the defendant be *selling* **both** the tying and the tied products, Wesley's claim fails as a matter of law for this reason, too.[12]

Third, a tying claim requires that the two products, of course, be separate. "A savvy lawyer can describe any product as a tie of its components . . . ." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 575 (7th Cir. 2022).  Wesley defines "exit services" as services offered "to select, access, and execute the exits," *i.e.*, the "exit products."  FAC at ¶149.  But it also alleges that Westgate "has 100% control over the availability of and **access** to its exits" and that "[o]nly Westgate can **execute** an exit from a Westgate timeshare."  *Id.* at ¶198 (emphases added).  Thus, two of the three so-called "exit services" are controlled by the only alleged provider of the "exit product," meaning Wesley is describing a tie of inseverable components.[13]  Where the two purported products are definitionally severable, "whether one or two products are involved turns . . . on the character of the

---

[11] *See*, *e.g.*, Fla. Stat. § 718.116; *In re Aliu-Otokiti*, No. 6:12-BK-14850-ABB, 2013 WL 1163782, *2 (Bankr. M.D. Fla. Mar. 19, 2013); *U.S. Bank Nat. Ass'n v. Long*, No. 13-C-0257, 2014 WL 2050662, *5 (E.D. Wis. May 19, 2014).

[12] *Accord Waldo v. N. Am. Van Lines, Inc.*, 669 F. Supp. 722, 730-31 (W.D. Pa. 1987); *De Jesus*, 87 F.3d at 71; *49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d 1463, 1469 (9th Cir. 1986).

[13] A leading treatise makes this point in a similar context, explaining there can be no tying of "retailing services that accompany a manufacturer's sale of its computer directly to consumers" because "[i]t is not possible to disaggregate . . . directly sold computers from the selling service."

demand for the two items," namely that there is sufficient demand for each product separately. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984). Wesley alleges this is met because "exit products" are available and sought only from the developer, while "exit services" are sought from additional providers, (FAC at ¶150), but that does not plausibly suggest there is demand for "exit services" separate from demand for "exit products" (especially when Wesley defines the latter to be available only from one source). To the contrary, "exit services" would be demanded only because a so-called "exit product" is sought.

### 2.     Market Power in the Tying Market

A tying claim must also plausibly allege that the "seller [has] sufficient market power in the tying product market to force the buyer to accept the tied product . . . ." *Amey*, 758 F.2d at 1502-03. But there is no such "product" or "product market" subject to "market power" forces. *See* discussion at 7-9, *supra*.

Attempts to limit a market to a single brand's customers are highly disfavored. *See*, *e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001). In an obvious attempt to invoke the *Kodak* exception to this rule, Wesley alleges purchasers of Westgate's timeshares are locked in to Westgate's power over voluntary terminations of those timeshare interests, the single-brand aftermarket that Wesley conjured. *See* FAC at ¶¶155 & 180. Such power, however, clearly is not derived from dominance of any market, but from a contractual relationship that Westgate timeshare owners entered into knowing that they would need the

---

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 1700 (4th ed. 2022).

assent of Westgate, the other party, to voluntarily terminate it. Courts, including the Eleventh Circuit, have repeatedly explained that such contracted limitations cannot be deemed market power, especially for purposes of a tying claim.[14] "[T]he mere existence and exercise of contract power does not show that a defendant had market power or violated the law," and provides "no reason . . . to believe that [the defendant's] decision to exercise its rights under [an] agreement also were exercises of market power." *Maris*, 302 F.3d at 1219, 1222. Thus, "a contractually mandated monopoly over an aftermarket is not a legally cognizable market." *Blizzard*, 941 F. Supp. 2d at 1236-37.[15]

### 3. The FAC Does Not Plausibly Allege Anticompetitive Effects in the "Westgate Exit Services Market"

First, the alleged tied single-brand aftermarket, the "Westgate Exit Services Market," is not plausible for the reasons discussed immediately above.

Second, the "market definition" limited to dissatisfied Westgate owners is

---

[14] *See Maris Distrib. Co. v. Anheuser-Busch*, 302 F.3d 1207, 1219, 1222 (11th Cir. 2002); *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 973 & 975 (9th Cir. 2008); *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat. Distrib. Co.*, 520 F.3d 393, 407, 408 (5th Cir. 2008); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008); *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 85 (2d Cir. 2000); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438, 443 (3d Cir. 1997); *United Farmers Agents Assoc., Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236 (5th Cir. 1996); *Bender v. Southland Corp.*, 749 F.2d 1205, 1215 (6th Cir. 1984); *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1236-37 (C.D. Cal. 2013).

[15] Significantly, as the *Maris* court noted, *Kodak* involved market power in the market for Kodak parts and was ***not*** based on a contract. *See* 302 F.3d at 1223. *See also Newcal*, 513 F.3d at 1048. Moreover, the reasoning of *Kodak* was based upon purchasers of a complex, durable good being required – "locked in" – to purchase parts or services *to continue to make use of a product they purchased* and a change in policy that resulted in them having to make those purchases from only the manufacturer. The reasoning of *Kodak* has been limited to those circumstances, which clearly do not apply here. *See, e.g.*, *Metzler*, 19 F. Supp. 2d at 1364-1365. Nor is there a change in policy. Like in *Metzler*, Wesley alleges a "longstanding business practice[ ]" of Westgate, (*id.* at 1365), "refusing to work with [an owner who is a Wesley customer] on an

"underinclusive" because the relevant market must "reflect[ ] the total market demand for plaintiffs' product, not just defendants' demand." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008). Wesley markets its services for other developers' timeshare owners, (FAC at ¶234), and "[b]ecause these are reasonably interchangeable buyers, the relevant market includes all of these potential consumers of" Wesley's so-called "exit services." *Id.* at 1119. Wesley does not suggest the "products" it sells Westgate owners "are not reasonably interchangeable with products made for other consumers," (*Acuity Optical*, 2016 WL 4467883 at *13), nor has it plausibly alleged any of the indicia required to support such a "submarket." *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). "[P]erspective is critical. In this case, the proper perspective is from the supplier's vantage point rather than the customer's view." *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 551–52 (D.N.J. 2019).

Third, even if this supposed tied market existed, Wesley does not plausibly allege the anticompetitive effects or injury required to state a tying claim. The Eleventh Circuit has laid out the required competitive harm quite clearly:

> injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value. . . . Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no injury can be claimed . . . .

*Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982). Here, Wesley alleges its "exit service" is on average far more expensive than the maximum that

---

amenable resolution to their dispute or the termination of their timeshare interests . . . ." FAC at

Westgate ever charges for both alleged "products." *See* FAC at ¶71(a).

Fourth, nor does the FAC permit the plausible inference that the alleged tying arrangement foreclosed any competition in any allegedly tied "exit services." On a tying claim, "the purchase of the tied product must be made contemporaneously with the sale of the tying product." *Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861, 881 (D. Del. 1987).[16] "[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition . . . ." *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009).[17] Nothing in the FAC permits the plausible inference that if a Westgate owner wanted to buy an "exit product" from Westgate that they would also want to buy a separate "exit services" product. Quite clearly, the purchase of an "exit product" obviates the need for any additional services at any cost, as the timeshare is terminated.

## C. Count IV (Collaboration to Injure Competition)

To establish a violation of Section 1 of the Sherman Act, "the plaintiff must first show that there was concerted action between two or more persons—a conscious commitment to a common scheme designed to achieve an unlawful objective—in restraint of trade." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072,

---

¶61. Wesley even warns about this in its form contracts. *See* Ex. A at p.1, ¶6; Ex. B at §6(b).

[16] *See also, e.g.*, *Systemcare, Inc. v. Wang Lab'ys Corp.*, 117 F.3d 1137, 1144 (10th Cir. 1997).

[17] *See also McGee v. First Fed. Sav. & Loan Ass'n of Brunswick*, 761 F.2d 647, 648–49 (11th Cir. 1985); *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006); *Patterson Dental Co. v. McGaughey*, No. CIV. 85-469-PA, 1985 WL 25732, *3 (D. Or. Dec. 9, 1985).

1079-80 (11th Cir. 2016) (internal quotation omitted).[18]  In rule of reason cases, the plaintiff must also allege "the anticompetitive effect of the defendant's conduct on the relevant market" and "that the defendant's conduct has no pro-competitive benefit or justification." *Levine*, 72 F.3d at 1551.

The alleged conspiracy participants, scheme, and objective are far from clear.  Wesley alleges a conspiracy between Westgate and ARDA, which seems to stand in as a sloppy proxy for some "problematic" ARDA members, apparently to injure the timeshare exit industry.  FAC at ¶¶10-11, 123, 192.  The Eleventh Circuit has made clear that where, as here, "the specific participants of the conspiracy are not even identified," "[s]uch pleading is inadequate to give the defendant fair notice of [Plaintiff]'s claim." *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1261 (11th Cir. 1998).  Settled law, in particular the Supreme Court's decision in *Copperweld Corp. v. Independent Tube Corp.*, 467 U.S. 752, 769 (1984), precludes a conspiracy between ARDA, a trade association, and Westgate, one of its many members.[19]  Nor would a conspiracy be plausible even if any other timeshare developers had been sufficiently identified, because Wesley insists upon creating single-brand sub-markets for each developer in

---

[18] A Section 1 claim is presumptively assessed under the rule of reason, with the *per se* rule applying only if the same alleged concerted action has previously been deemed anticompetitive. *See, e.g.*, *Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549-50 (11th Cir. 1996). And "[b]ecause trade associations may be protective of consumer interests and not just inimical to them," any alleged conspiracy involving such a group must be analyzed under the rule of reason. *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 290 (4th Cir. 2012).

[19] *See Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 620-21 (6th Cir. 1999) ("[T]he intracorporate conspiracy doctrine prevents the ABPS from conspiring with its members as a matter of law, because the diplomates and the ABPS are not independent legal entities for purposes of this antitrust claim" and "the

which it alleges each one has "market power" based on its supposed monopoly power over its respective "exit products," *e.g.*, the "Westgate Exit Services Market." FAC at ¶¶187-88, 190. Developers are alleged to "compete" only in their brand's "exit services" sub-market, and "no authority exists holding a defendant can conspire to monopolize a market in which it does not compete." *Aquatherm*, 145 F.3d at 1262 n.4.[20] A conclusorily-alleged "anti-poaching" conspiracy in an unidentified and irrelevant market cannot change that.

Even if Wesley had plausibly alleged any actionable participants to a conspiracy, such a claim "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 556-57. It is "well-settled" that the mere "participation in trade organizations provides no indication of conspiracy." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010). That is why it was held that two timeshare developers' membership in ARDA "is not enough to exclude the possibility that [they] were engaged in lawful conscious parallelism." *Wyndham Vacation Ownership, Inc. v. Montgomery L. Firm, LLC*, No. 8:19-CV-1895-CEH-CPT, 2021 WL 4948151, *13 (M.D. Fla. Oct. 18, 2021).

Moreover, Wesley's claim is based on a litany of allegations based upon acts by ARDA staff, not Westgate. Neither membership nor "participation on the association's board of directors" "render[s] an association's members

---

ABPS does not compete with its member diplomates . . . .").
[20] *See also United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986); *Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc.*, 242 F. Supp. 2d 1350, 1364 (S.D. Fla. 2003),

automatically liable for antitrust violations committed by the association." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). Wesley alleges, "[u]pon information and belief," without any basis, that ARDA was acting as Westgate's "agent." FAC at ¶117. That conclusory assertion cannot be credited.[21]

Furthermore, the actions allegedly taken by ARDA (contacting the BBB and coordinating calls to the AARP to drop Wesley as an advertiser) are conclusorily alleged and, even if they flowed from some never alleged agreement, they fail to qualify as unreasonable restraints of trade.[22] One of the long-recognized and permitted purposes of a trade association is to protect its members against "fraudulent" actors and "dishonest or irresponsible dealers" like Wesley. *Cement Mfrs.' Protective Ass'n v. United States*, 268 U.S. 588, 604 (1925); *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1048 (2d Cir. 1976).[23]

The FAC also alleges "[d]evelopers collude by instituting policies refusing to deal with third party exit firms," and *one* other identified developer instituted

---

*aff'd,* 376 F.3d 1065 (11th Cir. 2004).

[21] *See Hines v. FiServ, Inc.*, No. 808-CV-2569-T-30AEP, 2010 WL 1249838, *6 (M.D. Fla. Mar. 25, 2010). In any event, an agency relationship would preclude the separation of economic interests needed for concerted action. *See Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1295 (11th Cir. 1998); *Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1134–35 (3d Cir. 1995).

[22] Wesley never articulates how ARDA caused any agreement between the BBB and Wesley to be breached. Nothing in the FAC excludes the possibility that Wesley's purported agreement with the BBB allows it to suspend or revoke a "BBB accreditation and rating" upon learning that a company routinely acts in violation of its home state's main consumer protection law, which is the case with Wesley. Indeed, Wesley alleges it filed "appeals" with the BBB, suggesting there was some defined procedure for the measures the BBB allegedly took against Wesley.

[23] And even if the FAC had alleged ARDA communicated false information, "[d]isparagement is rarely a basis for finding [an antitrust violation] because even false statements about a single competitor do not meet the requisite standard of generating harm to competition," and, in fact, there is a presumption of "a de minimis effect on competition." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1268-69 (11th Cir. 2015). Here, as in *Duty Free*,

an affidavit requirement.  FAC at ¶¶129 & 189.  Wesley, however, states no facts suggestive "of a preceding agreement, not merely parallel conduct that could just as well be independent action," to refuse to deal with timeshare exit companies. *Twombly*, 550 U.S. at 556-57.  There is no indication of a time when timeshare companies supposedly knowingly worked with Wesley, let alone any so-called "simultaneous adoption" by unidentified companies that Wesley would like to pretend brought that imagined state of affairs to an end.  *E.g.*, FAC at ¶130.[24]

Allegations of the adoption of uniform tactics fail to plausibly suggest a conspiracy because that could be "prompted by common perceptions of the market," and thus some "plus factors" suggestive of conspiracy are required. *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726-27 (11th Cir. 2020).  The need for more is particularly acute here because Wesley's claim runs headlong into the general rule that "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Pac. Bell Tel. Co. v. Linkline Commc'n*, 555 U.S. 438, 448 (2009) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  There are no such allegations here, especially when "[t]he exchange of information between business firms" that are members in a trade association, including best practices "to protect themselves against fraudulent" actors, "has

---

Wesley plausibly alleges no false statements or harm to competition (as opposed to itself).

[24] Wesley's explanation that its form contract requires its customers to never disclose to "their timeshare developer that they have hired WFG or otherwise sharing with the developer any information concerning their engagement with WFG," (FAC at ¶61), describes a longstanding hostility and aversion by timeshare developers to work with the Wesleys of the world, not the

long been held to not violate the Sherman Act." *Michelman*, 534 F.2d at 1048.[25]

### D.    Count V (Monopolization and Attempted Monopolization)

The monopolization claim is implausible.  The only "market" in which the FAC alleges Westgate has "monopoly power" is its "exit product" market.  FAC at ¶¶198-199.  But an "exit product" is not a product and there is no such market for it for purposes of an antitrust claim.  *See* discussion at 7-9, *supra*.  Nor, in any event, does Wesley have standing to assert this claim since it is not a customer or competitor in any such "market."  *See Fla. Seed*, 105 F.3d at 1374.

The claim for attempted monopolization fares no better.[26]  First, "[e]ssential to either a § 2 monopolization or attempted monopolization claim is the defining of the relevant market, which is the antitrust plaintiff's burden." *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 971 F. Supp. 1419, 1426 (M.D. Fla. 1997), *aff'd*, 145 F.3d 1258 (11th Cir. 1998).  For the reasons set forth in connection with the tying claim, the "Westgate Exit Services Market" is not plausibly stated, requiring dismissal of this claim.

Second, to be predatory, the defendant's actions must constitute "conduct

---

result of some new, collusive agreement.  *See* Ex. A at p.1, ¶6; Ex. B at § 6(b).

[25] Wesley also alleges the conspiracy includes litigation, (FAC at ¶¶128 & 131), but provides nothing to render that plausible.  *Accord Wyndham*, 2021 WL 4948151 at *13 & n.10 (finding no plausible allegation of conspiracy from two timeshare companies using the same law firm to sue timeshare exit companies).  The failure to provide *any* supporting allegations is particularly glaring given the settled law that the *Noerr-Pennington* doctrine "shields a defendant from antitrust liability for resorting to litigation to obtain from a court an anticompetitive outcome." *Andrx Pharms., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1233 (11th Cir. 2005).

[26] A claim for attempted monopolization has three elements: (1) the defendant engaged in predatory or anticompetitive conduct, (2) the defendant had the specific intent to monopolize, and (3) there was a dangerous probability that the defendant might achieve monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *U.S. Anchor Mfg., Inc. v. Rule*

without a legitimate business purpose that makes sense only because it eliminates competition." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004). Westgate's practice of requiring an affidavit as a condition for its agreement to acquire an owner's timeshare hardly qualifies as illegitimate or irrational. To avoid harm to itself and to its timeshare owners, Westgate refuses to do business in any capacity with unlawful bad actors such as Wesley, which extends to Wesley's customers given the secrecy requirement. Given the *Westgate* summary judgment, it is **indisputable** and *established* that Wesley causes Westgate owners to default on their payment obligations through deceptive and unlawful business practices, misrepresenting that it provides a *legitimate* and *legal* service for the termination of timeshares. The affidavit requirement is an effective and permissible means of enforcing Westgate's policy.

"It is by now well settled that a unilateral refusal to deal is generally not unlawful. The Supreme Court has for many years emphasized that 'the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Duty Free*, 797 F.3d at 1265 (cleaned up) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)). Thus, "business are free to choose the parties with whom they will deal, as well as the . . . conditions of that dealing," (*Linkline*, 555 U.S. at 448), including where it "thinks such dealer is acting unfairly in trying

*Indus., Inc.*, 7 F.3d 986, 993 (11th Cir. 1993).

to undermine [its] trade.'" *Colgate*, 250 U.S. at 307. Westgate can elect from whom it will re-acquire a timeshare interest to not do business with persons acting in concert with Wesley or other timeshare exit companies that wreak consumer harm and undermine Westgate's business.

Third, there is no plausible assertion that Westgate has a dangerous probability of monopolization, *i.e.*, that it is "close to achieving monopoly power" in the "Westgate Exit Services Market." *U.S. Anchor*, 7 F.3d at 994. As an initial matter, Westgate is not in this "market." It does not engage in or offer "exit services," since that means dealing with Westgate (*i.e.*, itself) to obtain Westgate's agreement to terminate. A credit card company can agree to reduce or charge off a cardholder's debt, but because it can do so directly with a cardholder does not mean that it is in the "debt relief services" market populated by third-party companies that deal with it. Regardless, Wesley's bald allegation of "market power," (FAC at ¶118), is plainly insufficient. *See*, *e.g.*, *Omni Healthcare Inc. v. Health First, Inc.*, No. 6:13-CV-1509-ORL-37DAB, 2016 WL 4272164, *16 (M.D. Fla. Aug. 13, 2016) ("[I]f a plaintiff is to sustain an attempted monopolization claim with an allegation of less than 50% market share, he must also allege other reasons that make a monopoly dangerously probable.") (Dalton, J.).[27]

Fourth, Wesley still fails to plausibly allege harm to competition, simply stating Westgate gains "additional fees from unwilling and dissatisfied Westgate

---

[27] Wesley appears to be proceeding under a "monopoly leveraging" theory, (FAC at ¶¶198 & 204), under which this element would not apply. But that theory has long been rejected. *See Linkline*, 555 U.S. at 450; *Trinko*, 540 U.S. at 415 n.4; *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*,

timeshare owners, effectively locking" them into the contracts they signed. FAC at ¶204. These are not "additional fees," but pre-existing contractual obligations. Parties to a contract do not have some automatic right to buy a "product" to "exit" their contracts and avoid their obligations thereunder if dissatisfied (and Wesley charging them far more fees for an unlawful "service" is not pro-competition).[28]

### E.    Count VI (Florida Antitrust Act)

"Federal and Florida antitrust laws are analyzed under the same rules and case law.'" *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998). Thus, the Court should also dismiss Count VI.

## III.    WESLEY FAILS TO STATE A LANHAM ACT CLAIM

A Lanham Act claim must allege, among other things, "the advertisements of the opposing party were false or misleading" and "the advertisements deceived, or had the capacity to deceive, consumers . . . ." *Incarcerated Entm't, LLC v. Warner Bros. Pictures*, 261 F. Supp. 3d 1220, 1230 (M.D. Fla. 2017).

The advertisements complained of in the FAC, (¶¶70 & 72), are not actionable based on the terms "wins," "exit now," "3000% less" (less what?), etc. because they are "bald assertions of superiority or general statements of opinion."

---

205 F. Supp. 2d 1335, 1352-53 (S.D. Fla. 2002), *aff'd*, 54 F. App'x 492 (11th Cir. 2002).

[28] The FAC cites to *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). This is another page from an old antitrust playbook. The Supreme Court clarified in *Trinko* that *Aspen Skiing* embodies only a "limited exception" to the general rule that firms may choose the other companies with which they deal, and that case "is at or near the outer boundary of § 2 liability." 540 U.S. at 409. "*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under *Aspen*." *Covad Commc'ns Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004). *See also Duty Free*, 797 F.3d at 1266-67. Far from a voluntary course of dealing, Wesley alleges it requires its customers keep its involvement secret because Westgate refuses to work with its customers. FAC at ¶61.

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 496 (5th Cir. 2000).  The statement that only qualified owners can obtain a voluntary termination from Westgate cannot be deceptive, and it never suggested "the vast majority of owners" qualify.  FAC at ¶73(a).  Moreover, Wesley concedes some owners – "40-50%" who reach out – do exit their timeshares through Westgate.  *Id.* at ¶¶103, 159.  Nor does Wesley explain how "little effort" is false, especially when the only additional act on an owner's part it identifies is submitting a prepared affidavit.  *Id.* at ¶73(b).  Third, Wesley fails to explain how "understanding the resale market" is a false statement about the quality or nature of that market where timeshares are listed for sale.  *Id.* at ¶73(c).  The remainder of the claim is based upon omissions about eligibility requirements for Legacy, but as was ruled on the same type of claim about Wyndham's program, "[a]n omission is not actionable . . . unless the omission is relevant to an affirmative statement that is made false or misleading by its omission."  *Wyndham Vacation Ownership v. Reed Hein & Assocs., LLC*, No. 6:18-CV-02171-GAP-DCI, 2020 WL 12178190, *7 (M.D. Fla. Jan. 7, 2020).  As in *Wyndham*, the FAC identifies no such statement.

## IV.  WESLEY FAILS TO STATE A PLAUSIBLE FDUTPA CLAIM

Wesley's FDUTPA claim is a combination of its various grievances.  First, the portions of this claim premised upon the same conduct that fails to give rise to a Sherman Act claim cannot support a FDUTPA claim.  *See Athos Overseas, Ltd. v. Youtube, Inc.*, No. 1:21-CV-21698, 2022 WL 910272, *4 (S.D. Fla. Mar. 29, 2022).  Second, because the gravamen of this claim, which invokes a "fraudulent"

Legacy program and affidavit "scheme," sounds in fraud, (FAC ¶¶89, 90, 214), it must be stated with the particularity required by Fed. R. Civ. P. 9(b). *See, e.g.*, *Stires v. Carnival Corp.,* 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002). But notably lacking from the FAC are any "precise statements, documents, or misrepresentations made" by Westgate, or the "time, place, and person responsible for the statement[s]." *Brooks*, 116 F.3d at 1380–81.

Rather, the FAC's allegations are simply a general description of what Wesley believes the Legacy program and affidavit "scheme" to be, without identifying which of the 16 defendants are involved or how. Even if Rule 9(b) did not apply, this claim is long on conclusions, and far short on well-pleaded facts. Wesley states no facts consistent with a "blanket prohibition on timeshare owners using counsel or any third party . . . to assist them in exiting their Westgate timeshare." FAC at ¶214 (emphasis added).[29] That Westgate allegedly presents voluntary terminations on a take-it-or-leave-it basis cannot qualify as deceptive or unfair.[30] Nor has Wesley alleged any facts showing that Westgate gives "specific directions for timeshare owners to terminate their contracts with WFG," (FAC at ¶217), unreasonably restrains alienation of real property, or otherwise violates FDUTPA. Under settled law, Westgate can pick with whom it deals and on what terms in deciding whether to voluntarily terminate a timeshare.

Third, Wesley has not alleged how any consumer is harmed by the alleged

---

[29] The language quoted by Wesley applies to companies, lawyers, or law firms in the "timeshare exit or cancellation" field, and not *all* lawyers, law firms, or third parties. *See id.* at ¶¶82 & 86.
[30] *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346-47 (2011) ("[T]he times in which

practices (especially ARDA's alleged conduct), which is required. *See Sussman*, 387 F. Supp. 3d at 1364. Similarly, the lack of antitrust injury – ***especially*** because Wesley is an unlawful business that should not even be in operation – also precludes the FDUTPA claim. *See Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1290 (S.D. Fla. 2021).

## V. THE TORTIOUS INTERFERENCE CLAIM FAILS

A claim for tortious interference with contract requires, among other things, showing "the defendant's knowledge of the contract." *Sussman*, 387 F. Supp. 3d at 1348. The FAC conclusorily alleges this element, (FAC at ¶237), but states no facts plausibly suggesting Westgate intentionally acted to procure a breach of a contract it knew any particular Westgate timeshare owner had with Wesley. Wesley alleges the affidavit requirement applies to *all* Legacy applicants. *Id.* at ¶81. Indeed, Westgate allegedly ceases all communications with anyone even *suspected* of being a Wesley customer, (*id.* at ¶76), which is inconsistent with any intentional and knowing interference of their contracts with Wesley. Moreover, "where [this] tort is grounded on precisely the same 'anticompetitive' behavior alleged in . . . failed antitrust claim[s], it cannot as a matter of law constitute tortious interference . . . ." *Metzler*, 19 F. Supp. 2d at 1364. And nothing in the FAC alleges Westgate's conduct directly interfered with Wesley's contract with any of its customers, and "conduct that has only indirect consequences on the plaintiff will not support a claim for tortious interference."

consumer contracts were anything other than adhesive are long past.").

*Williamson v. Sacred Heart Hosp. of Pensacola*, No. 89-30084-RV, 1993 WL 543002, *51 (N.D. Fla. May 28, 1993), *aff'd*, 41 F.3d 667 (11th Cir. 1994).

The FAC also fails to allege interference with business relationships. The business relationship at issue must be an actual and identifiable relationship or prospective relationship, and not simply vaguely stated, unidentified "timeshare owners" who are "potential customers." FAC at ¶¶234 & 240. *Accord Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814-15 (Fla. 1994).[31]

## VI. THE CIVIL CONSPIRACY CLAIM FAILS AS A MATTER OF LAW

Under Florida law, a claim for conspiracy requires an actionable underlying tort or wrong. *Rebman v. Follett Higher Educ. Grp., Inc.*, 575 F. Supp. 2d 1272, 1280 (M.D. Fla. 2008). Although Wesley's claim invokes allegations in many of its other claims, it is premised on a conspiracy by Westgate to "tortiously interfere," and even incorporates the allegations of that claim. *See* FAC at ¶¶247, 249. Because Wesley fails to state a claim for any predicate cause of action, the civil conspiracy claim also must be dismissed.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants respectfully request that the Court enter an Order dismissing the First Amended Complaint.

---

[31] Nor can this claim be based on conduct by ARDA, not Westgate, regarding the BBB or AARP. Again, Wesley has failed to allege any facts to allow this Court to credit the assertion of an agency relationship. Moreover, tortious interference "requires wrongful action." *Cableview Commc'ns of Jacksonville, Inc. v. Time Warner Cable Se., LLC*, 901 F.3d 1294, 1305 (11th Cir. 2018). The FAC alleges literally no wrongful conduct by ARDA staff, and thus its conduct is equally consistent with a trade association acting lawfully regarding a bad actor.

## LOCAL RULE 3.01(g) CERTIFICATION

Undersigned counsel for Defendants certifies that he conferred with Patrick Bradford and Jacob Niergarth, counsel for Plaintiff, by telephone on February 8, 2024 regarding this Motion. Counsel advised that Plaintiff opposes the requested relief.

Dated: February 8, 2024         GREENSPOON MARDER LLP

        */s/ Roy Taub*
        Richard W. Epstein (Bar No. 229091)
        Jeffrey A. Backman (Bar No. 662501)
        Roy Taub (Bar No. 116263)
        200 East Broward Blvd., Suite 1800
        Fort Lauderdale, Florida 33301
        Telephone: 954-491-1120
        Facsimile: 954-343-6958
        richard.epstein@gmlaw.com
        maria.salgado@gmlaw.com
        jeffrey.backman@gmlaw.com
        mary.torres@gmlaw.com
        roy.taub@gmlaw.com
        cheryl.cochran@gmlaw.com

        Susana Cristina Garcia (Bar No. 92259)
        201 East Pine Street, Suite 500
        Orlando, Florida 32801
        Telephone: 407-425-6559
        Facsimile : 407-244-8115
        tina.garcia@gmlaw.com
        melissa.spinner@gmlaw.com

        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 8, 2024, a true and correct copy of the foregoing was electronically filed on the Court's CM/ECF document filing system, which will send notice of filing and a service copy to all counsel of record.

*/s/ Roy Taub*
ROY TAUB