# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

WESLEY FINANCIAL GROUP, LLC,

v.                                                          Case No. 6:23-cv-2347-RBD-LHP

WESTGATE RESORTS, LTD.;
WESTGATE RESORTS, INC.;
WESTGATE VACATION VILLAS,
LLC; WESTGATE LAKES, LLC;
WESTGATE GV AT THE WOODS,
LLC; WESTGATE TOWERS, LLC;
WESTGATE FLAMINGO BAY,
L.L.C.; WESTGATE MYRTLE
BEACH, LLC; WESTGATE PALACE,
LLC; WESTGATE GV AT PAINTED
MOUNTAIN, LLC; WESTGATE LAS
VEGAS RESORT, LLC; WESTGATE
BLUE TREE ORLANDO, LTD.;
WESTGATE DAYTONA, LLC;
WESTGATE GV AT TUNICA, LLC;
WESTGATE RVS ORLANDO, LLC;
and WESTGATE SOUTH BEACH,
LLC,

     Defendants.
_____

## ORDER

Before the Court is Defendants' (collectively, "Westgate") motion to

dismiss. (Doc. 43 ("Motion").) The Motion is due to be granted.

## INTRODUCTION[1]

With dissatisfied consumers enlisting so-called "exit" companies to escape unwanted timeshares in ever-higher numbers over the past decade, timeshare developers like Westgate—often coordinating through their industry trade group, the American Resort Development Association ("ARDA")—have sought to keep these exit outfits from doing business. (Doc. 29, ¶¶ 92–115.) These developers have inundated this District with protracted litigation against exit companies and their lawyers who instruct owners on relinquishing timeshares. *See, e.g., Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1353 (M.D. Fla. 2019). Westgate and other developers have also meddled with exit companies' marketing efforts—and launched marketing efforts of their own advertising developer-backed "exits"— hoping to draw dissatisfied owners to the developer first before seeking out third parties. (Doc. 29, ¶¶ 70–115.) This lawsuit concerns those tactics. (*Id.* ¶¶ 133–254.)

## BACKGROUND

Plaintiff Wesley Financial Group ("WFG") is a Tennessee-based exit company owned and operated by a former timeshare salesperson. (*Id.* ¶¶ 12, 29.) WFG solicits timeshare owners to help them get an "exit" from their timeshare contracts and offering a money-back guarantee if unsuccessful. (*Id.* ¶¶ 29, 60, 62.)

---

[1] The factual allegations are taken as true for the purpose of the Motion and presented in the light most favorable to Plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

At one point, WFG obtained accreditation and an A+ rating from the Better Business Bureau ("BBB"), which it advertised with the AARP, allegedly bringing in more than $10 million in revenue. (*Id.* ¶¶ 94–115.) WFG counts foreclosures, purchaser's defaults, and deeds-in-lieu as "exits." (*Id.*) WFG's "proprietary methods" to secure exits do not include the use of attorneys or the provision of legal services. (*Id.* ¶¶ 29, 60.) Rather, the provided service amounts to leveraging internal knowledge about how developers manage their inventory and the pitfalls along the way to repossession. (*Id.* ¶ 63.)

WFG knows that timeshare developers like Westgate will sometimes repossess timeshare interests from current owners to supplement their inventory rather than build new units. (*Id.* ¶¶ 9, 89, 153, 160.) Still, Westgate does not repossess financed timeshare interests with outstanding loan balances from owners current on their payments. (*Id.* ¶¶ 9, 67–68, 72.) Only paid-off (or inherited) timeshares qualify for voluntary repossession or termination with Westgate, and only at its discretion. (*Id.* ¶¶ 67–68.) But once an owner has been in default for around 270 days, Westgate typically forecloses on, or offers a deed-in-lieu for, the owner's timeshare interest—if repossession matches its inventory needs. (*Id.* ¶¶ 153–54, 161.) So after receiving an average $8,000 payment, WFG will tell its customers with balances due they can get out of their timeshare only if they stop making payments and then wait for the developer to foreclose on their interest

and offer to take it back. (*Id.* ¶¶ 72–76.) WFG bills this "default exit product" as "often the most preferred and economically advantageous exit to dissatisfied owners," even though it "often leads to negative credit reporting, which other forms of exit do not." (*Id.* ¶¶ 153–54, 161.)

In response, timeshare developers have not only sued exit companies but have also rebranded their existing voluntary repossession procedures as developer-backed "exits." One example is Westgate's Legacy Program, which ARDA advertises under a consumer protection initiative called the "Coalition for a Responsible Exit," hoping to direct dissatisfied owners to contact their developer first before turning to a third party. (*Id.* ¶¶ 9, 64–73.) Westgate also places its own ads with search engines; for example, queries for WFG return sponsored links with titles like "Get Started / Wesley Versus Direct: We Win – Exit Now For 3000% Less" and "Compare Us Versus Any Third Party. We Exit Qualified Owners Directly." (*Id.* ¶ 70.) Once it started suing exit companies, Westgate also stopped taking back interests from owners whom the developer even suspected of consulting an exit company, conditioning its repossessions on an affidavit swearing the owner has not worked with "any timeshare exit company, lawyer or law firm" in seeking cancellation, or if they have, disclosing the third party, handing over any contract with them, and promising to cooperate in any future lawsuit against them. (*Id.* ¶¶ 72–76.) Knowing this, WFG includes a confidentiality

clause in its contracts requiring its customers not to reveal they are working with an exit company. (*Id.* ¶ 61.) Westgate has sued owners it later discovered were WFG customers and signed the affidavit anyway. (*Id.* ¶ 80.)

In 2019, representatives with ARDA, on whose board two Westgate executives sit, allegedly contacted the BBB regarding WFG's accreditation, which the BBB then revoked despite the exit company's five-star rating based on more than a hundred customer reviews. (*Id.* ¶ 106.) The next day, ARDA representatives called the AARP to criticize it for continuing to run WFG's ads even though the exit company lost its BBB accreditation, requesting the organization run a competing ad denouncing the exit company. (*Id.* ¶ 111.) AARP members then inundated the organization with calls, allegedly coordinated by ARDA, complaining about WFG's ads, which the AARP stopped running based on the lost BBB accreditation. (*Id.* ¶¶ 112–15.) Westgate later sued the exit company in its home state for violating the Tennessee Consumer Protection Act, which WFG violated by engaging in the unlicensed practice of law, the district court ruled. (*Id.* ¶ 6.)

So WFG sued Westgate for: (1) false advertising under the Lanham Act; (2) per se tying; (3) rule of reason tying; (4) collaboration to injure competition; (5) monopolization and attempted monopolization under the Sherman Act; (6) a violation of the Florida Antitrust Act; (7) a violation of Florida's Deceptive and

Unfair Trade Practices Act ("FDUTPA"); (8) tortious interference; and (9) civil conspiracy. (*Id. passim.*) Westgate moves to dismiss (Doc. 43) and WFG opposes (Doc. 51). The matter is ripe.

## STANDARDS

A plaintiff must plead "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). On a motion to dismiss under Rule 12(b)(6), the Court limits its consideration to "the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). The factual allegations must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept the factual allegations as true and construe them "in the light most favorable" to the plaintiff. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009). But this "tenet . . . is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). So a pleading that offers mere "labels and conclusions" is insufficient. *Twombly,* 550 U.S. at 555.

## ANALYSIS

### I.    Count I – False Advertising

To state a claim for false advertising under the Lanham Act, a plaintiff must plead:

> (1) the statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception

had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) the plaintiff has been, or likely will be, injured as a result of the false or misleading statement.

*Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (cleaned up). "An omission is not actionable . . . unless [it] is relevant to an affirmative statement that is made false or misleading by its omission." *Wyndham Vacation Ownership v. Reed Hein & Assocs.*, No. 6:18-cv-2171, 2020 WL 12178190, at *7 (M.D. Fla. Jan. 7, 2020).

WFG claims Westgate's advertising "misrepresents [Westgate's] services, the Legacy Program's requirements, and what they will do for consumers."[2] (Doc. 29, ¶¶ 70–74.) WFG claims the ads branding the Legacy Program as an "exit" supposedly deceive consumers because the Program offers something different from what the exit company provides. (*Id.* ¶ 139.) WFG points to the statement that "[b]y working with Westgate Resorts, owners who chose to relinquish their timeshare have been able to do so with very little effort and have been able to relieve themselves of all future maintenance fee obligations." (*Id.* ¶ 73.) In other words, WFG accuses Westgate of advertising an "exit" without offering one available to most owners. (*Id.* ¶ 74.)

---

[2] WFG characterizes statements like "Exit Now For 3000% Less" and "We Win" as literally false, measurable misrepresentations of its product, but statements of opinion and bald assertions of superiority are generally not actionable. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1311 (11th Cir. 2010).

And therein lies the rub: Does "exit" suggest more than the end of an owner's contract with the developer? WFG appears to claim that any ad put out by Westgate advertising an "exit" is misleading if the ad characterizes the Legacy Program as anything but a waste of time. WFG acknowledges the Legacy Program "provides exits to a limited subset of Westgate owners when it is financially beneficial (to Westgate) to do so." (Doc. 54, p. 2.) It also admits that actual "exits" are something exit companies "are powerless to supply." (Doc. 29, ¶ 161.) So Westgate's advertising truthfully says direct "exits," like voluntary repossession and contract termination, are available to "qualified owners" and "qualifying accounts," but without detailing those qualifications—which WFG believes to misrepresent their availability. (*Id.* at 17 n.18.) For the omission to materially mislead, Westgate's statements that "we exit qualified owners directly" must somehow convey to consumers that the Legacy Program offers an option for contract termination available to most owners regardless of loan balance such that they buy nothing from WFG. *See Duty Free*, 797 F.3d at 1277–78.

While the statement that "owners who chose to relinquish their timeshare have been able to do so," considered alone, could lead owners with loan balances to believe that they too can relinquish their timeshares, the surrounding context mentioning "qualified owners" or "qualifying accounts" would indicate to a reasonable consumer that certain criteria will limit the exit's availability, since

8

"qualified owners" does not mean or imply "most owners." *See Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.*, 299 F.3d 1242, 1248 (11th Cir. 2002) ("[A] court must analyze . . . the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other."). But even if the statements are misleading, they still must influence purchasing decisions to cause consumers to withhold trade. *See id.*

Falsely advertising an available "exit" cannot deceive owners into no longer seeking an exit. Statements like "We Win," "Exit Now For 3000% Less," and "Qualified Owners" may lead hopeful owners to inquire further about the Legacy Program, but it is implausible to say that those statements cause owners to not hire WFG or seeking its services when that inquiry leads to a dead end. (*See* Doc. 29, ¶¶ 70–74, 138–42.) As WFG alleges the ads are misleading only because Westgate advertises "exits" unavailable to owners with outstanding loan balances, those ads only direct owners to ask about the Legacy Program, and that inquiry does not keep those owners from later hiring an exit company, the alleged "deception" causes no decision by those owners to withhold trade from WFG or any other exit company. As WFG cannot sufficiently allege the misleading statements are the proximate cause of any lost sales, even accepting all facts pled as true and construing them in WFG's favor, it cannot state a Lanham Act claim. *See Duty Free*, 797 F.3d at 1277.

## II.     Counts II–VI – Antitrust

As to the antitrust claims, WFG argues that Westgate's affidavit requirement illegally ties its "exit services" (like the Legacy Program) to its timeshare contract terminations ("exit products"), constitutes unlawful collaboration with other developers, and monopolizes the exit services market.[3] (Doc. 29, ¶¶ 146–207.) The Court disagrees.

Antitrust law protects competition, not individual competitors, and so requires plaintiffs to establish "antitrust standing." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004). To establish antitrust standing, a private plaintiff must: (1) have suffered "antitrust injury," which arises from harm to *competition* in a relevant market stemming from illegal restraints on trade or exercises of monopoly power; and (2) be an "efficient enforcer of the antitrust laws, which requires some analysis of the directness or remoteness of the plaintiff's injury." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir. 1991).

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product,

---

[3] For purposes of antitrust standing, "[f]ederal and Florida antitrust laws are analyzed under the same rules and case law." *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998). So the Court will not discuss the Florida antitrust claim separately.

or at least agrees that he will not purchase that product from any other supplier,"
which is illegal "if the seller has 'appreciable economic power' in the tying product
market and if the arrangement affects a substantial volume of commerce in the
tied market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62
(1992) (cleaned up). Attempted monopolization requires "(1) that the defendant
has engaged in predatory or anticompetitive conduct with (2) a specific intent to
monopolize and (3) a dangerous probability of achieving monopoly power."
*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Sherman Act claims
challenging tying arrangements, conspiracy, and monopolization typically require
the plaintiff to define the relevant market to find antitrust injury. *See Walker Process
Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). The relevant
market is "the area of effective competition"—that is, "the arena within which
significant substitution in consumption or production occurs." *Standard Oil Co. of
Cal. v. United States*, 337 U.S. 293, 299–300 & n.5 (1949). To survive a Rule 12(b)(6)
motion, antitrust plaintiffs typically must allege sufficient definitions of both a
geographic market and a product market. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d
1327, 1336 (11th Cir. 2010).

To determine a relevant product market, a court looks not to contractual
restraints on a particular consumer, which "always . . . affect a party's available
choices," but rather to "the uses to which the product is put by consumers in

general and whether there are interchangeable substitutes." *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1222 (11th Cir. 2002). So "[d]efining the relevant product market involves identifying producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services." *Jacobs*, 626 F.3d at 1337–38 (cleaned up) (discussing "the cross-elasticity of demand and reasonable substitutability of the products").

WFG posits the two relevant nationwide product markets being tied are for "exit products," defined as "deed-backs, deeds in lieu of foreclosure, mutual releases, and quit claims," and the "exit services to select, access, and execute the exits."[4] (Doc. 29, ¶ 149.) According to WFG, Westgate is a vertically integrated business offering timeshare interests and, in the "aftermarket," both exit products and services. (*Id.*) Developers are the only entities able to supply so-called "exit products" to owners of their brand's timeshares, WFG says. (*Id.* ¶¶ 150–52.) In offering the Legacy Program, Westgate competes with exit companies in the exit services market, according to the exit company. (*Id.*) So by "denying access to its exits to those consumers who hire third-party services companies" or "requiring a

---

[4] At other points, WFG refers to the relevant market as "the market of dissatisfied timeshare owners" or "the dissatisfied timeshare owner exit services market," with "sub-markets" comprised of each individual developer's dissatisfied owners. (Doc. 29, ¶¶ 142, 156, 172, 188, 190.) But dissatisfied owners are the *buyers* in this case and they do not buy themselves, but "exit services." Further, the "exit services" WFG and other exit companies provide are neither developer-specific, nor does the price for them vary by developer, so each individual developer's dissatisfied owners are not submarkets. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962).

formal Affidavit stating that the owner is not working with a third-party service provider," WFG asserts, "Westgate ties its exit services to its exit products" and leverages its "100% market share" in exit products to monopolize the exit services market. (*Id.* ¶¶ 155, 171, 180–81.) In so doing, Westgate harms WFG by amping the downside risk posed to potential owners up to prohibitive levels when enlisting the exit company's assistance—effectively "foreclosing competition, foreclosing sales, and forcing a refund of previously-consummated [sic] sales," the exit company says. (*Id.* ¶¶ 172–73, 183.)

Stripped of their antitrust window dressing, however, WFG's claims come undone because its harm is not the sort that antitrust law can mend. First, as to the relevant market, consumers do not buy legal remedies like foreclosures or deeds-in-lieu, nor do they put them "to use." *See Jacobs*, 626 F.3d at 1337–38. To be a product, an item, or service must be merchantable, in that buyers must be able to make an offer to buy the item or service that the seller can accept and then inject into the stream of commerce. *See Eastman Kodak*, 504 U.S. at 462–64; *Maris,* 302 F.3d at 1221. Dissatisfied Westgate owners looking to get out of their timeshares wish to undo their original purchase of a timeshare interest, not make another purchase. *Cf. Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 614 (1953) (relevant market was advertising space, not readership).

Westgate does not put its discretion up for sale, so foreclosures and deeds-

in-lieu are not part of the relevant market. It is black-letter contract law that if one party to a bilateral agreement wishes to terminate the contract, the other party may unilaterally dictate the terms under which it will forfeit, waive, rescind, or otherwise relinquish the benefit of its bargain. *E.g.*, *Newkirk Constr. Corp. v. Gulf Cnty.*, 366 So. 2d 813, 815 (Fla. 1st DCA 1979) ("Modifications of contracts must be supported by new consideration as well as the consent of both parties."). Likewise, a party seeking enforcement of the contract may elect whichever remedies for breach it desires, so long as they do not conflict with each other. *Armour & Co. v. Lambdin*, 16 So. 2d 805, 809 (Fla. 1944) (discussing plaintiff's "right to choose, or the act of choosing between different actions or remedies"). Negotiations between counterparties to a contract to terminate their agreement and legal remedies for breach are not purchasable commodities or services, even when the renegotiated terms require one party to remit some payment to the other for release. *See Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1390 (11th Cir. 1990). So there is no separate market for "exit products" to be tied to anything. *See Maris,* 302 F.3d at 1221.

Instead, the relevant market is one Westgate does not serve: unsanctioned exit services walking owners through the Legacy Program or the foreclosure/repossession process after they default. Even though Westgate advertises developer-backed "exits," the Legacy Program does not substitute for

WFG's "exit services," which often involves guidance through that very program. For one, Westgate only discusses termination of contracts to which it is a party, not those of other developers too, and those discussions do not involve purchasing anything but more Westgate timeshares. (Doc. 29, ¶¶ 187–88.) Tying only occurs if "the buyer was forced to buy a product that he did not want or would have preferred to buy elsewhere on other terms." *Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1416 (11th Cir. 1987), *modified by Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991). And owners want an "exit" and they buy "exit services" only because Westgate will not provide one. To use WFG's own words, "when a dissatisfied owner seeks an exit from Westgate, Westgate stonewalls the owner with a deceptive and tortuous process designed to prevent them from exiting or otherwise terminating their timeshare," and the developer does not inform the owner about the foreclosure process, so "Westgate's 'service' thus denies access to what is often the most preferred and economically advantageous exit to dissatisfied owners." (Doc. 29, ¶¶ 159, 161.) Purveyors of "exit services" do not work against their customers' interests to keep them from exiting their timeshares. Timeshare developers similarly do not work against their own interest to offer ways for customers to avoid paying their financial obligations.

Westgate also has a legitimate business purpose for declining repossession

to exit company clients, even when the developer usually makes money reselling a repossessed interest. Westgate is a timeshare developer and *financier*, selling timeshare interests in its resorts and, crucially, *loans for those interests*. (Doc. 29, ¶¶ 45, 47–48, 68, 160.) In executing a sale, owners often enter loan contracts with Westgate, which it services. (*Id.*) Westgate then packages most of those loans together and sells them to investors as asset-backed securities to finance its operations. (*Id.* ¶ 68.) As a cost of doing business, developers must discount the purchase price of these securities commensurate to the expected default and prepayment risk among the debtors. *See* Jeffrey Haas, Corporate Finance § 40 (2d ed. 2021). Westgate thereby incurs fiduciary and contractual duties to minimize defaults by holding owners to their contracts—which also acts to minimize the required discount—and in some cases, to supplement underperforming tranches with non-delinquent loans. *See id.* So Westgate cannot terminate contracts for owners current on their loan payments, and it must take steps to enforce the contracts of owners who default, starting with collections calls and negative credit marks and escalating to suits for breach and foreclosure. So WFG cannot claim that Westgate offers "exit services" that undermine its securitization efforts without providing any revenue.

So Westgate did not push its way into the exit services market at all—let alone by exploiting its dominant position in another one, which is "the essence of

illegality in tying agreements." *Times-Picayune*, 345 U.S. at 611. It neither amassed control over a commodity or service—because an "exit" is neither—nor leveraged that control to prevent anyone else from providing it. *See Lorain J. Co. v. United States*, 342 U.S. 143, 149 (1951). There is no above-market price that Westgate creates by unilaterally withholding contract cancellations from exit company customers. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). And no facts support that "no developer will offer assistance in exiting a competitor-developer's timeshare" as a product of collusion in a timeshare industry cabal. (Doc. 29, ¶ 180.) Without more, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *See Twombly*, 550 U.S. at 556. And "no authority exists holding a defendant can conspire to monopolize a market in which it does not compete." *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1262 n.4 (11th Cir. 1998).

WFG's harm does not stem from attempted monopolization or restrained trade, but obsolescence in a changing business landscape. Antitrust law protects competition in markets, but not the markets themselves. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). "Exits" occur at Westgate's discretion. For years, there was an opening for exit companies to guide owners out of their contracts because Westgate followed a uniform repossession process for owners in default regardless of with whom they spoke. WFG sold information

about the process. Now, Westgate no longer abides by this process, changing its business methods to stave off defaults by solvent owners, so WFG no longer can sell the information with any assurance it will result in an "exit." Destruction of a market, rather than competition in the market, is a harm the Sherman Act does not address, at least not on these facts. *See Brunswick*, 429 U.S. at 488.

Because WFG did not suffer antitrust injury, even accepting the factual allegations as true and construing them in the light most favorable to WFG, Counts II–VI are due to be dismissed for lack of antitrust standing.

### III.   Count VII – FDUTPA

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To assert a claim for damages under FDUTPA, the plaintiff must establish: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008). "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). "Importantly, an act is not deceptive and a practice is not unfair unless a consumer was actually aggrieved by the act or practice."

*Baptist Hosp., Inc. v. Baker*, 84 So. 3d 1200, 1204 (Fla. 1st DCA 2012).[5]

WFG says these are Westgate's unfair trade practices: "its promotion and use of the misleading Legacy program," "its participation in and weaponization of ARDA to interfere with WFG's relationships with the BBB and AARP," and "the blanket prohibition on owners from using any third party to assist them in exiting their timeshares, including legal counsel." (Doc. 29, ¶ 214.) Advertising the Legacy Program—which is undisputedly the only developer-backed way to cancel a Westgate timeshare—does not injure consumers substantially, even if the ads lead consumers to phone trees or high-pressure sales pitches before learning Westgate will not let them out. *See supra*. The same goes for the alleged ARDA interference because consumers are not harmed by fewer ads for WFG's services. Nor does FDUTPA extend indirect liability to third parties for the unfair and deceptive acts of another, regardless of their relationship. By its plain text, FDUTPA makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce," so a defendant must have engaged in one of those acts or practices to violate the act. *See* Fla. Stat. § 501.204. Further, the act only permits courts "to enjoin any person *who has violated, is violating, or is otherwise likely to violate*" the

---

[5] The parties spill much ink on whether Federal Rule of Civil Procedure 9(b) applies to the FDUTPA claim such that the claim was stated with sufficient particularity, but the Court need not reach that issue because denying contract termination to one class of timeshare owners is not "substantially injurious to consumers" as proscribed by statute.

consumer law and limits recovery to "the actual damages *caused by an act or practice in violation of this part*." *Id.* § 501.207. So Westgate cannot be held indirectly liable under FDUTPA for ARDA's unfair and deceptive acts. That leaves the prohibition on third-party assistance.

WFG characterizes the affidavit requirement as a blanket prohibition on owners receiving any third-party assistance in canceling their timeshare.[6] (*See* Doc. 29, ¶ 216.) The language in the affidavit is sweeping: Owners must swear that they have never worked with and are not currently working with "any timeshare exit company, lawyer or law firm in the furtherance of my attempts to receive either the cancellation of, or a deed back in relation to," their timeshare contract, and that they never "paid any timeshare exit company, lawyer or law firm to assist [them] with writing correspondence to [Westgate] or to advise [them] as to certain statements to make to [Westgate] in order to induce a cancellation of, or a deed back in relation to," their timeshare contract. (*Id.* ¶ 82.) Blocking consumers from speaking with attorneys about a contract as a condition of bargaining, and

---

[6] At other points, WFG acknowledges that:

[A]n owner that has used a third party's assistance in attempting to secure an exit may still be eligible to be released by Westgate, but only if they agree to breach their contract with WFG by identifying the exit company or other third party with which they worked, agreeing to provide any and all information regarding the third party to Westgate, and agreeing to cooperate with Westgate in pursuing claims against the third party.

(Doc. 29, ¶ 85.)

punishing consumers if they have done so, offends public policies favoring "access to redress," "access to courts," and the uninhibited ability to engage in "full and frank communication" with an attorney about potential legal matters. *See Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974) ("The prospective application of a general release to bar private [] actions arising from subsequent violations is clearly against public policy."); *Rules Regulating the Fla. Bar*, 494 So. 2d 977, 1069 (Fla. 1986) ("[L]egal assistance in coping with the web of statutes, rules, and regulations is imperative for all persons."); *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (the purpose of attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice"); *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013) (courts may invalidate, on public policy grounds, agreements that "operat[e] . . . as a prospective waiver of a party's right to pursue statutory remedies"). So Westgate could harm consumers by denying contract termination to any owner who seeks assistance from a *lawyer* in procuring it—which the developer appears to implicitly acknowledge by denying that the affidavit's language encompasses "*all* lawyers, law firms, or third parties." (Doc. 43, p. 23.)

But WFG does not identify a basis to say the same about a prohibition on contracting any *exit company* for assistance. WFG faults Westgate for offering

terminations on a take-it-or-leave-it basis, but employing contracts of adhesion is not an unfair trade practice on its own. *Cf. Hobby Lobby Stores, Inc. v. Cole*, 287 So. 3d 1272, 1276 (Fla. 5th DCA 2020). "[B]usinesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commc'n*, 555 U.S. 438, 448 (2009). Timeshare exit companies such as WFG are essentially at the developers' mercy to develop their own policies—the developers changing those internal policies, even those hoping to put exit companies out of business, do not become unfair trade practices because exit outfits can no longer exploit them for money to extract timeshare owners from their contracts with any assurance of success.

Timeshare contract terminations are not some overriding consumer good whose blanket availability the law protects. It is not plausible to suggest that it is unethical, unscrupulous, or substantially injurious to consumers for Westgate to change its termination and repossession policies and procedures—even intending to nullify exit outfits' methods that rely on getting the developer's owners to stop payments. *Cf. Baptist Hosp.*, 84 So. 3d at 1204. Only WFG is aggrieved by these affidavits, not consumers. *See id.* As to any "specific directions for timeshare owners to terminate their contracts with WFG," the exit company only alludes to "forcing a refund of previously-consummated sales." (Doc. 29, ¶ 173.) But WFG offers its customers a money-back guarantee if the customer cannot obtain an

exit—despite having no control over whether Westgate will do so and knowing the developer will not do so if it discovers the exit company's involvement. (*Id.* ¶¶ 60, 173, 217.) Westgate does not violate FDUTPA by triggering it or instructing owners on how to do so. After all, refunds do not harm consumers. So Count VII is due to be dismissed.[7]

## IV.    Counts VIII & IX – Tortious Interference & Civil Conspiracy

Finally, WFG's tortious interference and derivative civil conspiracy claims center on the affidavit requirement, ARDA's conversation with the BBB preceding its accreditation revocation, and the later complaints it organized to the AARP, allegedly at Westgate's direction.

Under Florida law, the elements of a tortious interference claim are: (1) the existence of a business relationship (or contract) between the plaintiff and a third party; (2) a defendant's knowledge of that relationship; (3) a defendant's intentional and unjustified interference with the relationship, causing it or performance of the contract to cease; and (4) consequent damage to the plaintiff. *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1325 (11th Cir. 2004). The elements of civil conspiracy are: "(1) an agreement between two or more parties; (2) to perform an unlawful act; (3) the doing of some overt act in pursuance of the

---

[7] All of the above counts are due to be dismissed with prejudice, as they cannot be colorably repled. *See Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) (leave to amend is futile when amendment would still be dismissed).

conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cnty.*, 616 So. 2d 562, 565 (Fla. 2d DCA 1993). Tortious interference with a business relationship can constitute an unlawful act for pleading a claim for civil conspiracy. *Am. Diversified Ins. Servs., Inc. v. Union Fid. Life Ins. Co.*, 439 So. 2d 904, 907 (Fla. 2d DCA 1983).

WFG's pleading of these counts is deficient because the alleged "interference" is either nothing of the sort or wholly lawful and justified.[8]  First, the exit company characterizes the affidavit requirement as intentional interference with the confidentiality provision in its client contracts. (*See* Doc. 29, ¶ 239.) But WFG cannot manufacture a tortious interference claim by adding a term to its contracts that Westgate's preexisting practices would force the clients to breach. As pled, WFG intentionally added a confidentiality clause to its contracts *because* Westgate started requiring owners to swear they have not employed an exit company or reveal its involvement to obtain termination. (Doc. 29, ¶ 61.) Knowing Westgate now requires owners to disclose exit company involvement to achieve an exit, WFG cannot add a term barring that disclosure

---

[8] To the extent that WFG seeks to hold Westgate liable for the actions of ARDA, the exit company fails to provide a legal theory (such as vicarious liability) by which Westgate may be held responsible for ARDA's alleged tortious interference. Westgate is only alleged to have executives on the ARDA board and to have told the trade group to contact the BBB. That alone is not grounds for indirect liability.

into its exit services contracts and then cry tortious interference when Westgate demands the exit company's involvement be revealed. This does not plausibly plead tortious interference. Barring circumstances not present here, Westgate need not terminate any of its owners' contracts absent a court order, no matter what terms an exit company puts in its contracts promising to secure it.[9] "There is no such thing as a cause of action for interference which is only negligently or consequentially effected." *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1224 (Fla. 3d DCA 1980) (interference must be direct and invade the plaintiff's individual rights). Westgate's general policy, applied across all owners whose contracts it terminates, "interferes" with WFG's contracts consequentially, not directly. *See Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) (no cause of action exists for tortious interference with a business's relationship to the community at large). Even the exit company admits that "Westgate may not have known which owners have contracts with WFG." (Doc. 54, p. 19.) Additionally, tortious interference will not lie "where the defendant was the source of the business opportunity allegedly interfered with." *Genet Co. v. Anheuser-Busch, Inc.*, 498 So.

---

[9] Cutting off contract terminations to one class of defaulted owners does not close off all avenues for a defrauded owner to exit their contract, even though WFG sometimes implies as much. (Doc. 29, ¶¶ 9, 56, 74, 119, 128, 202, 217; Doc. 54, p. 19 ("unwanted and fraudulent upgrades and upselling").) If an owner believes Westgate's sales representatives lied to them or fraudulently induced them to buy the timeshare, then the owner's remedy is rescission upon presenting proof of fraud in court, either as an initial claim or a defense to the developer's collections.

2d 683, 684 (Fla. 3d DCA 1986). Westgate's repossession process is the source of WFG's business with its clients. So the affidavit requirement does not constitute interference or an unlawful act. *See Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, No. 6:19-cv-1908, 2022 WL 999872, at *6 (M.D. Fla. Mar. 22, 2022) ("Plaintiffs have not presented this Court with any evidence that Lawyer Defendants personally directed any relevant owner to stop paying.").

Westgate's actions to ensure its owners stay current on their payment obligations are not actionable. So long as "improper means" are not employed, "activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable." *KMS*, 361 F.3d at 1327 (cleaned up). Illegally or not, WFG convinces solvent Westgate owners who contract its exit services to default on their timeshare contracts. (Doc. 29, ¶ 89.) After all, the exit company touts the "default exit product" for owners who stop payments. (*Id.* ¶ 154.) Refusing to terminate contracts for exit company clients is a proper, lawful exercise of Westgate's discretion as a contract party and is justified to safeguard its securitization efforts. *Ethan Allen*, 647 So. 2d at 815. So Westgate at least did not tortiously interfere.

Without establishing tortious interference, WFG cannot plead an underlying unlawful act comprising the civil conspiracy. It alleges Westgate directed ARDA to speak with the BBB, which resulted in the Bureau revoking the

26

exit company's accreditation unless it complied with some unspecified set of objectionable requirements. (*See* Doc. 29, ¶ 106.) Then the trade group allegedly beset upset seniors on the AARP to complain about the exit company, which caused the Association to drop WFG as an advertising partner. (*See id.* ¶ 111.) But what did Westgate say to ARDA? What were the terms of WFG's contracts with the BBB and AARP, if any, that those organizations breached? And what *improper* thing did ARDA say to those two organizations? A plaintiff cannot succeed in a tortious interference case if the defendant merely gave a third party truthful information. *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1092 (11th Cir.1994); *see also Fla. Star v. B.J.F.*, 491 U.S. 524, 526 (1989). The BBB revoked WFG's accreditation, so communicating that to the AARP is not actionable. (*See* Doc. 29, ¶ 111.) Without basic facts about the content of the alleged intermeddling statements, the Amended Complaint does not allege facts indicating the alleged interference was improper. *See KMS*, 361 F.3d at 1327 (affirming dismissal where no improper means alleged).

As pled, Westgate's affidavit requirement does not constitute unlawful interference. A business does not tortiously interfere with another's business relationships by eliminating the usefulness of its services in navigating its internal policies. On the face of the Amended Complaint, Westgate is justified in erecting barriers to the "default exit product" so that its solvent owners keep up with their

payment obligations. Because WFG does not sufficiently allege ARDA did anything improper or unlawful in communicating with the BBB and AARP, and that it took those actions out of an agreement with Westgate, the exit company has not stated the second element of a civil conspiracy claim, either. *Am. Diversified*, 439 So. 2d at 907. So Counts VIII and IX are due to be dismissed without prejudice, and WFG may file a second amended complaint if it can state colorable arguments for these counts.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1. Westgate's Motion to Dismiss (Doc. 43) is **GRANTED**. Counts I–VII are **DISMISSED WITH PREJUDICE**. Counts VIII and IX are **DISMISSED WITHOUT PREJUDICE**.

2. By **Wednesday, September 11, 2024**, WFG may file a Second Amended Complaint in line with this Order. Failure to timely file will result in this action being closed without further notice.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on August 28, 2024.



ROY B. DALTON, JR.
United States District Judge